288 So.2d 102 (1974)
Charles William FOX, III
v.
ARGONAUT SOUTHWEST INSURANCE COMPANY.
No. 5702.
Court of Appeal of Louisiana, Fourth Circuit.
January 8, 1974.
*103 Samuel C. Gainsburgh, New Orleans, (Kierr, Gainsburgh & Benjamin, New York City, of counsel), for plaintiff-appellant.
Adams & Reese by Henry B. Alsobrook, Jr., New Orleans, for defendant-appellee.
Before BAILES, FLEMING and BRADLEY, JJ. Pro Tem.
ROBERT M. FLEMING, Judge Pro Tem.
This case presents an appeal from a judgment of the Civil District Court of Orleans Parish rejecting the demands of appellant for damages against Argonaut Southwest Insurance Company, the liability insurer of Ochsner Clinic, Ochsner Medical Foundation and their respective medical staff. Appellant filed this suit to recover damages for the alleged failure of Alton Ochsner Medical Foundation's emergency room personnel to properly minister to appellant at the emergency room of the hospital on June 2, 1967 at about 3:00 a.m. He contends that the failure of the resident in charge to correctly diagnose his condition and the failure of the emergency room personnel to follow the instructions of appellant's admitting physician, Dr. Figueroa, and to accord appellant the proper treatment for the ailment from which he was in fact suffering, caused him emotional and physical injury that he would not have sustained had the correct diagnosis been made or Dr. Figueroa's orders followed. With written reasons assigned the district court rendered judgment rejecting the appellant's claims and dismissing the action.
The evidence shows that Mr. Fox first consulted Ochsner Clinic in April, 1967, at which time he became a patient of Dr. Figueroa. Because of appellant's complaints at that time, two electrocardiograms (EKG) were ordered, one the routine type and the other the exercise type, the latter being made just three days prior to the events out of which this litigation arises. The EKGs were functioning within normal limits.
Around midnight of June 1, 1967, Mr. Fox awakened with feelings of acute indigestion that progressed into chest pains which were unrelieved by digestive aids. In the early hours of June 2, the pain had spread into his arms, which felt heavy. He was weak, pale, nauseous and cold. At Mr. Fox's request his mother telephoned Dr. Figueroa who advised that Mr. Fox should be brought immediately to the emergency room at Alton Ochsner Medical Foundation. Dr. Figueroa then telephoned the emergency room and advised of Mr. Fox's impending arrival and ordered them to perform an EKG with instructions to notify him when the EKG had been completed. It was Dr. Figueroa's intention to go to the emergency room and review the EKG tracing.
Mr. Fox and his mother were driven by his then fiance to the emergency room. His respiration, pulse and blood pressure were not normal. An EKG was done and was abnormal. The doctor on duty at the emergency room of the hospital at this time did not obtain the prior EKG's on Mr. Fox and did not compare them, even though he had access to them. This doctor apparently was not advised of Dr. Figueroa's orders to be called upon the completion of the EKG and he did not confer with him. Even though the EKG was not normal the emergency room physician did not feel that the patient was having a heart attack; he gave Mr. Fox an injection of Vistaril and Demarol and a dose of Maalox, advised Mr. Fox to return to his home and contact his doctor later in the day if he did not feel any better. Mr. Fox walked out of the hospital, rode home with his mother and fiancé, walked up the steps to his house and an interior stairway to his bedroom where he remained until the middle of the day of June 2. He remained in a weakened condition, feeling pain and anxiety all of this time. About this time the fiancé of Mr. Fox, who is now Mrs. Fox, contacted Dr. Figueroa who advised *104 her to return Mr. Fox to Ochsner Clinic, which was done. After examination, Mr. Fox was immediately hospitalized on cardiac care, around 4:00 that afternoon.
The main thrust of the appellant's case is that the emergency room physician should have recognized that the appellant was having or had had a heart attack during or before the time that he was in the emergency room of the hospital; that had he compared the current EKG with the prior ones this would have been obvious; that had the emergency room physician called Dr. Figueroa, Dr. Figueroa would have recognized the malady and immediately hospitalized Mr. Fox. The appellant contends that the failure to immediately hospitalize Mr. Fox upon his treatment and diagnosis in the emergency room caused additional heart damage to Mr. Fox as well as pain, suffering and mental anguish from the period of time he left the emergency room to the time he was returned to cardiac care in the hospital.
The appellees contend that the treating physician at the hospital properly treated Mr. Fox according to the information he had in the emergency room and that regardless, Mr. Fox suffered no damage by virtue of the late hospitalization. The trial court found that the doctor acted in a reasonable manner in the application of his skill in this situation, that there was no evidence to support a charge of negligence or malpractice against Dr. Figueroa, Ochsner Clinic or the hospital. The trial court specifically found that the plaintiff did not sustain any additional damage as a result of being sent home from the emergency room, that Mr. Fox suffered his heart attack while at home and that he received no additional damage as a result of not being hospitalized immediately.
In the case of Meyer v. St. Paul Mercury-Indemnity Co., 225 La. 618, 73 So.2d 781 (1953), the Supreme Court of this state recognized the rule that:
"A physician, surgeon or dentist, according to the jurisprudence of this court and of the Louisiana Courts of Appeal, is not required to exercise the highest degree of skill and care possible. As a general rule it is his duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case."
This rule of jurisprudence has not been changed. In the case of Foster v. St. Paul Fire and Marine Insurance Co., 212 So.2d 729 (La.App., 4th Cir., 1968), it was followed, and the court adding that:
"* * * The court further declared that under this rule it is `encumbent on the physician, surgeon or dentist, who becomes a defendant in a malpractice case to show that he is possessed of the required skill and competence indicated and that in applying that skill to the given case he used reasonable care and diligence along with his best judgment.' * * *"
As was pointed out by this court in Phelps v. Donaldson, 243 La. 1118, 150 So.2d 35 (1963), physicians, surgeons and dentists are not insurers of the results of treatment afforded patients. However, under the circumstances of this case, we are of the opinion that the emergency room physician although admittedly competent ordinarily, made a mistake to the appellant's detriment.
All medical experts who testified agreed that the recognized method of treatment for cardiac patients is immediate bed rest and hospitalization. It is likewise obvious that the emergency room physician did not follow this method of treatment because, for some reason, he misinterpreted the cardiogram. Admittedly however the cardiogram was abnormal and this physician had access to prior normal cardiograms of plaintiff with which to compare this one although he made no effort to do so. This *105 physician likewise admitted that in his past experience in the Air Force such a case as this one would have warranted the obtaining of a second opinion as to the interpretation to be placed on the EKG. Again this procedure was not followed.
All experts agreed that plaintiff's cardiogram was abnormal and that, had he been their patient, plaintiff would have been hospitalized immediately. This was not done. We therefore are of the opinion that the emergency room physician was remiss in not exercising the degree of care which we understand would have been employed by members of his profession under similar circumstances.
However, the question thus remains what, if any, damage plaintiff suffered as a result of his non-hospitalization.
None of the medical experts who testified could state that plaintiff suffered additional heart damage as a result of his non-hospitalization. In fact several of these experts voiced the opinion that the damage to plaintiff's heart had occurred prior to his coming to the emergency room in the first place. On this point plaintiff's regular physician, Dr. Julio E. Figueroa, testified in part as follows:
"Q. Now, from your review of the electrocardiograms and your history that you know of Mr. Fox and his subsequent treatment and development and physical characteristics, did Mr. Fox sustain any damage to his heart as a result of being sent home that night, that morning in the emergency room?
"A. I would say no.
"Q. Why would you say this, Doctor?
"A. Because in reviewing the initial history and the subsequent course including the electrocardiograms and the lab studies, I believe that the insult on the myocardial initial damage to the heart muscle occurred before he was seen in the emergency room. The natural history of myocardial infarction is one in which the initial insult occurs and as I said earlier it takes time for the changes that we record to occur.
"Q. Is that the Q wave you are talking about?
"A. The electrocardiographic changes, the Q wave, the T and ST segment changes, it takes time for these changes to occur and secondly the benzomatic or blood studies, the blood changes that occur in these patients also take time, these enzymes that we measure in the blood there is a certain level of these enzymes in every person, in every normal person, and it takes time for these enzymes to be released from the heart muscle to the dead heart muscle into the circulation and in reviewing the case, the peak of the enzymes that Mr. Fox had, that we have of the studies dispute this way, the peak of the value is on these enzymes occurred about thirty-two hours after Mr. Fox was seen in the emergency room and in the natural history of acute myocardial infarction a peak of this occurs around forty-eight hours, after thirty-two hours his level started to come down.
"Q. Now, the course that Mr. Fox had as far as his physical well being after the first electrocardiogram that was taken in the emergency room on June 2, 1967, is that the type of course, that progress that you would expect to see in a patient of Mr. Fox's condition?
"A. Yes, it is."
Other experts likewise referred to plaintiff's enzyme level as indicative of his sustaining all heart muscle damage as a result of an infarc which occurred prior to his emergency room treatment. Since all experts agree that a patient's enzyme level should peak approximately 48 hours after the infarc, they surmised that plaintiff suffered *106 his attack prior to treatment because his enzymes peaked approximately 32 hours after he came to the emergency room. None of the experts could state that immediate hospitalization would have, in any manner, altered a later cardiogram of plaintiff which showed irreversible heart damage.
It is an elementary rule of our jurisprudence that plaintiff has the burden of proving all allegations of damages in his petition. Foggin v. General Guaranty Insurance Company, La.App., 207 So.2d 176. We do not consider that plaintiff has met this burden of proof with regard to his contention that he suffered additional heart damage or a diminution of longevity as a result of his nonhospitalization.
We are likewise of the opinion that plaintiff has substantiated his allegation that he suffered pain and anxiety which he would not have experienced had he been admitted to the hospital for treatment immediately. Undoubtedly plaintiff could have been made more confortable both mentally and physically had he been admitted to the intensive care unit of the hospital where he could have been monitored for any changes in his condition. He would have likewise had at his disposal the trained staff of the cardiac care unit to minister to him in such a way as his family at home was unequipped to do. We therefore are of the opinion that the trial court erred in failing to grant judgment in favor of plaintiff to recompense him for the physical pain and suffering and mental anguish which he experienced during the approximately 13 hours which elapsed between the time he first went to the emergency room and his ultimate hospitalization. Under the circumstances we are of the opinion that plaintiff should receive the sum of Three Thousand Dollars which we feel is just compensation.
For the foregoing reason the judgment of the lower court is reversed and judgment is rendered in favor of plaintiff, Charles William Fox, III, and against defendant Argonaut Southwest Insurance Company in the full and true sum of Three Thousand Dollars, together with legal interest from date of judicial demand until paid and all costs of these proceedings.
Reversed.