435 So.2d 479 (1983)
Jean E. GENDUSA, et al.
v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY, et al.
No. 13316.
Court of Appeal of Louisiana, Fourth Circuit.
June 3, 1983.
Rehearings Denied August 23, 1983.
*480 H. Martin Hunley, Jr., Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, for defendants/appellants J. Carlos Pisarello, M.D. and St. Paul Fire & Marine Ins. Co.
Edward J. Rice, Jr., Adams & Reese, New Orleans, for defendant/appellant J. Carlos Pisarello, M.D.
Wilfred H. Boudreaux, Barker, Boudreaux, Lamy, Gardner & Foley, Robert H. Blomefield, New Orleans, for plaintiff/appellee/appellant Michael Gendusa.
Before SCHOTT, BARRY, AUGUSTINE, BYRNES and LOBRANO, JJ.
LOBRANO, Judge.
This is a damage suit based on alleged medical malpractice by Dr. Carlos Pisarello. The plaintiff is Michael Gendusa (the suit was originally filed by his father in Michael's behalf but following his attainment of the age of majority Michael was substituted as plaintiff) and the defendants are Dr. Pisarello and his liability insurer, St. Paul Fire and Marine Insurance Co. The case was originally tried to a jury with a resulting verdict in favor of defendants. Subsequently, the trial court granted plaintiff's motion for a new trial, and the case was then tried to a judge who awarded plaintiff a judgment in the amount of $36,000. From this judgment defendants have appealed contesting liability and plaintiff has appealed seeking an increase in the amount of damages.
In this court defendants raise the issue that the new trial was improperly granted, the record does not support the trial judge's conclusion that Dr. Pisarello's treatment of plaintiff was substandard and constituted medical malpractice, and, as a matter of law, plaintiff is not entitled to recover the damages as explained by the trial judge in his reasons for judgment. Plaintiff bases his appeal on the issue that the trial court committed manifest error in failing to conclude that plaintiff's loss of eyesight was the result of Dr. Pisarello's malpractice.
On October 29, 1974, when plaintiff was 12 years of age, he was seen by his pediatrician, *481 Dr. A.J. Giorlando with complaints of headaches and vomiting. Dr. Giorlando diagnosed his condition as bilateral papilledema or swelling of the optic nerve and referred plaintiff to Dr. Robert Cangelosi, an ophthalmologist. His examination confirmed severe papilledema in both eyes and visual acuity was found to be 20/40 and 20/50 respectively. Dr. Cangelosi diagnosed a brain tumor causing increased intracranial pressure and recommended hospitalization. On October 30, Dr. Giorlando had plaintiff hospitalized. Neurological tests confirmed the papilledema with raised optic discs, gliosis and flamed hemorrhages in the optic nerve. Dr. Giorlando then referred plaintiff to Dr. Pisarello, a neurosurgeon. Testing by Dr. Pisarello confirmed the findings of the neurologists and he, like Dr. Cangelosi, diagnosed intracranial pressure caused by a brain tumor blocking the circulation of spinal fluid in the brain.
In surgery Dr. Pisarello found that there was no brain tumor but that plaintiff's Aqueduct of Sylvius, the passageway between the third and fourth ventricles of the brain, was blocked by a web. This was removed and the spinal fluid flowed freely through the aqueduct. Plaintiff remained in the hospital under Dr. Pisarello's care until November 27th and he was later seen by Dr. Pisarello or his associate, Dr. Richard Corales, on December 2, 9, 16 and 23, 1974. There is no contention by plaintiff that Dr. Pisarello's treatment was substandard throughout this period of time. Although there was some suggestion by plaintiff that Dr. Pisarello should have installed a shunt, a permanent apparatus which relieves intracranial pressure in the event it should reoccur, plaintiff specifically renounced any claim of negligence with respect to Dr. Pisarello's operative procedures including his decision not to install the shunt, or his post operative care both in and out of the hospital until the end of December, 1974. The claim for malpractice is based upon Dr. Pisarello's conduct between January and April, 1975.
Dr. Pisarello saw plaintiff on January 6th, in early February, and on March 7, 1975. Each time he checked the boy for increased intracranial pressure by determining with an ophthalmoscope that the veins in the back of the eye (fundus) were pulsating normally and by feeling the soft spot where the hole had been made in his skull in connection with the brain surgery to determine if it was pulsating normally. The central factual dispute in the case is over what information was being given to Dr. Pisarello by plaintiff's parents concerning his condition during this period. According to plaintiff's mother, she told Dr. Pisarello that the boy was having constant bouts with headaches, nausea and vomiting. According to Dr. Pisarello, he was told only that the boy had awakened with a headache on January 7th but that this had subsided by the time he examined the boy that day and that the boy had vomited earlier on the February day when Dr. Pisarello saw him. In the meantime plaintiff's mother realized that her son's eyesight was failing so she took him back to Dr. Cangelosi on April 11, 1975, when he found that the boy's eyesight had deteriorated to 20/200 in each eye making him legally blind. Dr. Cangelosi found no signs of papilledema or increased intracranial pressure.
At Dr. Pisarello's suggestion Mrs. Gendusa took her son to another ophthalmologist, Dr. Sanford Pailet, on April 16, 1975. He measured his eyesight at 20/400 on this occasion. Again, Dr. Pailet found no evidence of papilledema or increased intracranial pressure.
At this point Mrs. Gendusa decided to bring plaintiff to another neurosurgeon, Dr. Richard Coulon, who examined the boy on April 29th and May 2nd when an EMI scan was made. This is a procedure whereby X-rays are taken of slices of the skull enabling the viewer to see the condition of each part of the brain. This showed a buildup of fluid in the ventricles (hydrocephalus) and a narrowing (stenosis) of the connecting aqueduct. He thought the boy would need a shunt but since he found no evidence of increased intracranial pressure he elected to have the boy followed up by himself and an ophthalmologist "for several months at monthly intervals."
*482 However, Dr. Coulon received a letter from Mr. and Mrs. Gendusa concerning their son which changed his plans. In it they reported the following: Three days after plaintiff returned to school on January 3, 1975, his teacher told Mrs. Gendusa that plaintiff "could not see the blackboard, was having trouble reading and writing." The following week the school principal told Mrs. Gendusa that plaintiff had fainted and vomited. When she took plaintiff to Dr. Pisarello he told her to keep the boy in school so she did. A few days later the principal reported to her that the boy couldn't recognize her and was having trouble going down the stairs. The principal also reported these things to Dr. Pisarello. Plaintiff continued vomiting so she took him out of school and got a private tutor for him. The tutor told her Michael had trouble seeing. Throughout this period Mrs. Gendusa was taking the boy to the pediatrician who prescribed supositories for the boy's vomiting. Although he took these for two or three weeks he got worse and she reported this to Dr. Pisarello leading to the February examination. Following this Dr. Pisarello told her the boy was fine and she worried too much. After another week without improvement she again called Dr. Pisarello who had her take him to the hospital for X-rays of the brain. Two days later Dr. Pisarello assured her that the boy was fine. When she last saw Dr. Pisarello on March 7th he told her "everything was perfect" and he did not have to see the boy again for three months. Nonetheless, the boy did not improve, he was very nervous, he continued to vomit occasionally and "he started fainting again". After taking her son to Drs. Cangelosi and Pailet and learning that the boy was legally blind she decided to take him to Dr. Coulon "because [she] had no more confidence in Dr. Pisarello".
Dr. Coulon explained that before he got this letter he could not get a clear picture of the boy's history but this clearly showed that he was having problems for sometime "which when organized seemed to be consistent with increased intracranial pressure, and this was certainly consistent with the EMI scan..." He was planning "within the next several days" to have the Gendusas bring their son back to him for evaluation but he received a phone call from Mr. Gendusa a day or two after he got the letter in which he (Gendusa) told him the boy "was deteriorating and he was having more and more problems". At this point on May 6th Dr. Coulon hospitalized plaintiff for the purpose of installing a shunt.
While this installation was being made and the catheter was inserted into the right lateral ventricle the fluid from the brain "shot out approximately one foot" from the catheter dramatically demonstrating the presence of increased intracranial pressure. It was Dr. Coulon's opinion that the pressure had caused the boy's nausea, vomiting and other symptoms.
Dr. Pisarello called three neurosurgeons as expert witnesses. Drs. Corales, John Jackson and Donald Richardson, testified that Dr. Pisarellos' conduct upon examining plaintiff in January, February and March of checking the pulsation of the veins in the fundus with an ophthalmolscope and palpating the burr hold in the skull to check pulsation was the proper treatment within the standards for neurosurgeons. They also attributed plaintiff's loss of vision to the initial case of severe papilledema from increased pressure in October, 1974.
On this question of the cause of the loss of plaintiff's eyesight Dr. Coulon was not so specific. He simply stated that if the intracranial pressure had been high enough initially "it's possible within a short period of time to get serious problems with vision".
The questions to be resolved by the trial court were whether Dr. Pisarello's treatment from January through March was substandard so as to constitute malpractice and whether such malpractice caused plaintiff to lose his eyesight. The court answered the first question affirmatively but was not convinced of the second. It is appropriate to consider the trial court's extensive reasons for judgment in detail. These contain the following findings and conclusions:
1. Dr. Pisarello failed to respond appropriately when advised of plaintiff's symptoms *483 in the first week of January, 1975. Faced with an array of complaints as to headaches, nausea and vomiting he was under a duty to do more than check for normal pulsation of the veins in the fundus of the eye and of the soft spot in plaintiff's head. That duty included admitting the boy to the hospital and referring him to an ophthalmologist and other skilled professionals.
2. Dr. Pisarello breached a duty to treat plaintiff's headaches, nausea and vomiting or to refer him to his pediatrician or another physician for treatment even if he was convinced that there was no increased intracranial pressure.
3. Although there was evidence that plaintiff's original condition in October would progressively cause his loss of eyesight no one testified that continued loss was inevitable. Dr. Pisarello was negligent in refusing to have plaintiff further tested to determine that some visual acuity remained worthy of saving.
4. It is more probable than not that plaintiff's vision would be reduced by increased intracranial pressure; but, Dr. Pisarello by refusing to hospitalize plaintiff denied him "the option of determining whether there was continued deterioration of vision due to the original episode of intracranial pressure or a subsequent one."
5. Plaintiff was not able to prove that Dr. Pisarello's inattention was the cause of further loss of visual acuity so that he is not entitled to a substantial sum for damages. But plaintiff was denied the opportunity of knowing what his condition was without having an eye examination and Dr. Pisarello should not be allowed gain by his inappropriate conduct. For this plaintiff was awarded $15,000.
6. Plaintiff suffered emotional scars from the knowledge "that increased intracranial pressure, if not relieved, will surely result in death;" and from his observation of his parents' "grave concern". He also suffered the embarrassment of vomiting in the presence of his friends and relatives but the doctor continued to tell him nothing was wrong with him. For this plaintiff was awarded $1,000 per week from January 5 until May 7, 1975.
In order to deal properly with the case in this court it seems that plaintiff's position should be first considered. His position is that he lost his eyesight not because of the first episode of intracranial pressure but because of some second episode which occurred between November 7, 1974, and May 7, 1975, and which would have been detected by Dr. Pisarello but for his negligence. In effect, plaintiff is arguing that the trial court committed manifest error in his November 5th conclusion that plaintiff could not prove causation. In support of this position plaintiff first relies on the testimony of Dr. Pailet, the second ophthalmologist who examined him.
Although Dr. Pailet was of the opinion that the initial episode of severe papilledema and intracranial pressure in October was the cause of plaintiff's loss of eyesight, his opinion was predicated on the belief that the papilledema first diagnosed on October 29th was present for two to three months. However, Dr. Giorlando, the pediatrician, had seen plaintiff on August 28th and September 5th and his partner saw him on September 27th, and no papilledema was noted on these visits. From this plaintiff would discredit Dr. Pailet's opinion that the papilledema was of sufficient duration to cause plaintiff's blindness.
In the first place, the record shows that plaintiff was seen by Dr. Giorlando on August 28th for a laceration of the knee and the stitches were removed on September 5th. On September 27th he was seen for frontal headaches and the diagnosis by Dr. Giorlando's partner (who did not testify) was "nasal ferringitis (sic)". When Dr. Giorlando examined plaintiff on October 29th the complaint was headaches and vomiting of a twenty-four duration and the examination revealed some blurring and edema of the disc which led him to suspect papilledema and to refer him to Dr. Cangelosi. There is nothing here to support the inference that the papilledema was not *484 present on these earlier visits since there is no indication that the boy's eyes were examined on these occasions.
On the other hand, Dr. Pailet testified unequivocally that papilledema of a short term does not cause decreased visual acuity to the extent of 20/40 and 20/50 as measured by Dr. Cangelosi on October 29th. He went on to say that once the decrease was present it would continue to decrease even with adequate relief of intracranial pressure and that an "irreversible condition due to a decrease in visual acuity at the time of the initial examination by Dr. Cangelosi" had already begun leading to optic atrophy.
Furthermore, Dr. Cangelosi was in a unique position to provide an opinion on this point. He had seen plaintiff in October, measured visual acuity as 20/40 and 20/50 and diagnosed severe papilledema. He saw him next on April 11th and measured visual acuity as 20/200. On direct examination he testified the eventual blindness was the result of the original condition in October. He explained that when he examined the boy in April there was no papilledema and no sign of intracranial pressure. There was optic atrophy, or deadness of the optic nerve. He went on to explain that while papilledema may not show up where there is optic atrophy because the nerve fibers are dead and less likely to swell you could see "signs of wrinkling of the retina or hemorrhages" with increased pressure but there were none. We have concluded that Dr. Cangelosi's overall testimony supports the conclusion that more probably than not the final condition was caused by the initial papilledema with only a possibility remaining that some undetected increase in pressure between January and April contributed significantly to the final condition. We therefore agree with the trial court that plaintiff failed to prove by a preponderance of the evidence that Dr. Pisarello's conduct between January and April of 1975 was a cause of plaintiff's loss of vision.
Turning to defendants' appeal we must return to the trial judge's reasons for judgment and determine if they support the judgment under the law applicable to this case.
Plaintiff's burden of proof is outlined in LSA-R.S. 9:2794 as follows:
"... where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred."
Although this legislation was adopted after Dr. Pisarello's alleged malpractice it is retroactive in effect. Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La.1978). In determining whether Dr. Pisarello failed to exercise reasonable care and diligence, a court is guided by the opinions of expert witnesses who are qualified to testify on the subject. Guillory v. Buller, 398 So.2d 43 (La.App. 3rd Cir.1981). A physician is not obligated to be right always in making a diagnosis and it is not malpractice to miss a diagnosis. Making a diagnosis is an act of professional judgment and may not be considered an act of negligence. Lauro v. Travelers Insurance Company, 261 So.2d 261 (La.App. 4th Cir.1972) writs refused, 262 La. 188, 262 So.2d 787. Malpractice exists in a case of misdiagnosis only if it results from the failure of the physician to exercise the standard of care prevailing for members of the same profession under similar circumstances. Borne v. Brumfield, 363 So.2d 79 (La.App. 4th Cir.1978).
The trial judge found that Dr. Pisarello was derelict in failing to treat plaintiff for his nausea, vomiting and headaches. *485 Specifically the lower court concluded that Dr. Pisarello should have hospitalized plaintiff for further testing, and that his failure to do so under the given circumstances constituted negligence on his part. We agree. Dr. Pisarello is a neurosurgeon, a skilled professional, who performed serious surgery on plaintiff in November of 1974. Subsequent to that surgery, he failed to heed warning signs and symptoms, i.e. vomiting, nausea, and deterioration of eyesight which other physicians felt were indicative of continued or increased intracranial pressure. Dr. Pisarello argues that he was not given those symptoms, but plaintiff's parents insist he was. He did admit to being told that plaintiff woke up with a headache on one occasion, and that he had vomited on another. The parents testified that he was given much more information. We are convinced that plaintiff did, in fact, have continued nausea and vomiting spells in the three to four months following surgery. Obviously the trial court believed the parents, and we see no manifest error in that credibility call.
Although Dr. Pisarello's post operative examinations were acceptable methods of determining increased intracranial pressure, it is clear that nausea, vomiting and deterioration of eyesight occurring in the circumstances of plaintiff's situation should have warranted further tests and hospitalization. Dr. Pisarello admitted this. Specifically he testified:
"Q. I believe then that you had told us beforeand this will be my last questionif there had been any episodes of continued vomiting and/or headaches, you would have immediately hospitalized the young man for further hospitalization?
A. What I have said is if at any time I had a suspicion that the intracranial pressure had risen, I would have hospitalized this young man to observe him myself for a period of a week to ten days and draw definite conclusions and proceed accordingly.
Q. My question was phrased differently. In order to determine that fact, if it has been reported to you that there was nauseaI don't mean one episode of nauseathat he was having continual nausea and/or continual headaches, you would have hospitalized him for continued investigation?
A. That's correct.
Q. In fact, it's required as far as the standards of neurosurgery?
A. That would be the correct thing to do, yes."
Defendant argues that there is no proof that plaintiff was in fact suffering from intracranial pressure at the time of his visits to Dr. Pisarello, and therefore he should not be responsible for any damages during that period of time. We disagree. The negligence of Dr. Pisarello is that he failed to do what he should have done under the given circumstances. His failure to perform other tests, irrespective of the possible or probable outcome of those tests, is the basis of his negligence.
DAMAGES
In order to determine the correctness of the trial court's assessment of damages, we, once again, turn to the reasons for judgment. It provides as follows:
"In awarding damages to the plaintiff, this Court is fully aware of the fact that plaintiff was not able to prove that the inaction of Dr. Pisarello had resulted in further loss of visual acuity. If plaintiff could have demonstrated this, with any precision, the award in this case would be much greater. But this Court does not feel that Dr. Pisarello should be allowed to deny plaintiff the opportunity to determine what his post operative condition was, without the benefit of testing of his eyesight in January or other subsequent occasions when plaintiff experienced headaches, nausea and vomiting. To do so would allow defendant to "gain" by his own inappropriate actions. The Court fixes a minimum of $15,000.00 for this failure.
The remaining damages are fixed at approximately $1,000.00 per week from January *486 5, 1975, to May 7, 1975. Whereas at first blush this may appear high, this Court views such an award as modest. It is difficult to tell what emotional scars have resulted from plaintiff's knowledge that increased intracranial pressure, if not relieved, will surely result in death. Additionally, plaintiff suffered severe emotional and mental distress when he observed the grave concerns of his parents each time he experienced the episodes so dramatically described by his mother. Then too he suffered the embarrassment of the vomiting in the presence of his school mates, friends and relatives while his doctor literally said "there is nothing wrong with you". This unnecessary suffering Dr. Pisarello allowed to continue for several months."
We see no manifest error in the award of $1,000.00 per week from January 5, 1975 to May 7, 1975 for the nausea and vomiting episodes. This is reasonable, and well within the trial court's great discretion in the assessment of damages.
However, serious argument is made with respect to the $15,000.00 award made by the trial court because defendant denied "... plaintiff the opportunity to determine what his post operative condition was, without the benefit of testing of his eyesight in January or other subsequent occasions when plaintiff experienced headaches, nausea and vomiting." Defendant argues that there is no evidence in the record to show that plaintiff's course would have been any different even with hospitalization, and therefore the $15,000.00 award was improper. We disagree. The trial court found:
"... that it is more probable than not that the vision of Michael would be further reduced by increased intracranial pressure. However, Dr. Pisarello by refusing to hospitalize his patient denied his patient the option of determining whether there was continued deterioration of vision due to the original episode of increased intracranial pressure or a subsequent one."
In the case of Fox v. Argonaut Southwest Insurance Co., 288 So.2d 102 (La.App. 4th Cir.1974) the plaintiff was rushed to the emergency room of Oscher Foundation Hospital with severe chest pains, and nausea. The physician in the emergency room misdiagnosed plaintiff's heart attack, and sent him home. Thirteen hours later plaintiff was hospitalized on cardiac care. The defendant doctor argued that even though there might have been negligence in the misdiagnosis, plaintiff was unable to prove any damage to his heart as a result thereof. The court agreed that plaintiff was not able to prove that he suffered additional heart damage as a result of his nonhospitalization. However the court did award damages to the plaintiff for the pain and mental anxiety he sustained for the approximately 13 hours between his first visit to the emergency room and his eventual hospitalization. The court stated:
"Undoubtedly plaintiff could have been made more confortable (sic) both mentally and physically had he been admitted to the intensive care unit of the hospital..." Fox, supra at 106.
Certainly, fifteen thousand ($15,000.00) dollars is reasonable for the approximately three and one half months of anxiety, worry and fear which plaintiff suffered in the instant case. We will not disturb that award.
MOTION FOR NEW TRIAL
As previously stated, this matter was tried before a jury on June 12th thru 16th, 1978 wherein a verdict was rendered in favor of defendant. Upon proper motion by plaintiff, the trial judge (Judge Carriere) granted a new trial without assigning reasons therefor. Subsequently Judge Carriere died, and the matter was retried before the Honorable Revius Ortigue. Defendant complains that Judge Carriere was in error in granting the new trial.
Although we are not favored with any reasons, we must assume that the learned trial judge found merit to plaintiff's argument. Plaintiff argued that it was error in the original trial for the court to deny him the opportunity to produce Dr. Richard Coulon as a rebuttal witness. We *487 cannot say there was any abuse of the great discretion afforded the lower court on such an issue, and therefore reject defendant's argument.
For the reasons assigned herein, the judgment of the lower court is affirmed. Appellants are to bear all costs.
SCHOTT and AUGUSTINE, JJ., dissenting with reasons.
SCHOTT, Judge, dissenting:
Applying R.S. 9:2794 and the cases cited in the majority opinion to the facts of this case I conclude that the trial judge erred in his judgment.
Every doctor who testified in this case stated that Dr. Pisarello exercised proper care and diligence when he examined plaintiff with an ophthalmoscope to determine that the veins in the fundus of the eye were pulsating and palpated the soft spot in the skull to check pulsation. However, plaintiff contends that none of these opinions was predicated on the neurosurgeon having knowledge that the boy was continuously suffering from headaches, nausea and vomiting, which Dr. Pisarello had as found by the trial court. Plaintiff specifically refers to the admission by Dr. Pisarello that if he had gotten a history of nausea, vomiting and headaches in the boy he would have hospitalized him, observed him for a week or ten days, drawn conclusions and acted accordingly and that such conduct would have been required under proper neurosurgical standards. Thus, says plaintiff, since we must accept the findings of the trial judge that he had such knowledge of his condition he was guilty of malpractice in failing to hospitalize the boy. He argues further that hospitalization and close observation would have disclosed increased intracranial pressure, the shunt would have been installed, and the boy's eyesight prevented from further loss.
The serious flaw in this argument is that it presupposes that there was increased intracranial pressure at any time until May 7 when Dr. Coulon installed the shunt. It is significant that Dr. Coulon was not ready to hospitalize plaintiff and install the shunt even after he had the EMI scan and after he received the Gendusas' letter. He testified:
"After reading this, I had planned within the next several days to contact the Gendusas and have them bring Michael back to me to evaluate him...."
From this comment I do not perceive a note of urgency even after Dr. Coulon had the letter. What prompted immediate action is the following as related by Dr. Coulon:
"... but I received a phone call within a day or two of getting this typewritten story, typewritten history from Mr. Gendusa who said he thought his son was deteriorating and he was having more and more problems and he was very concerned, and it was at that point I told him I thought the child ought to be in the hospital, that I was concerned, also."
It may be that this was the only incident of increased intracranial pressure since October. Plaintiff argues in effect that he must have had it earlier and Dr. Pisarello should have treated it properly since he was armed with the same information Dr. Coulon had when he finally decided to hospitalize the boy. But Dr. Coulon's testimony is otherwise. It was the phone call which triggered the hospitalization, not the letter.
Next, the trial judge found that Dr. Pisarello breached a duty in failing to have plaintiff referred to an opthalmologist and "other skilled professionals." Yet, not one expert testified that he had such a duty. The trial judge charged Dr. Pisarello with negligence by his "refusal .... to submit (plaintiff) for further testing to determine whether some visual acuity remained which was worthy of saving ..." Yet, no expert testified that prevailing standards of the neurosurgical specialty imposed such a duty.
The trial judge found that Dr. Pisarello was derelict in failing to treat plaintiff for his nausea, vomiting and headaches or to refer him to his pediatrician for such treatment; but the record shows that plaintiff was a regular patient of Dr. Giorlando, the pediatrician, throughout this period. In fact, Dr. Giorlando saw the boy in his office *488 on January 30 and February 18, 1975, and prescribed suppositories for his vomiting and he may have refilled this prescription for suppositories on March 11.
The trial court found that Dr. Pisarello's refusal to hospitalize plaintiff and/or to refer him to an ophthalmologist somehow denied plaintiff the ability or opportunity to determine whether his loss of vision was the result of the first or some subsequent incident of increased pressure and the award of $15,000 was to compensate plaintiff for being denied this opportunity. The trial court also observed that this award would prevent Dr. Pisarello from profiting by his inappropriate conduct.
I am unable to find any legal or equitable support for such an award. In order to conclude that Dr. Pisarello was liable to him for any damages plaintiff had the burden of proof set down in R.S. 9:2794. Upon failing to prove that his loss of eyesight was the result of Dr. Pisarello's departure from the standards of his specialty his case ended. Plaintiff cannot recover on the theory that even though the doctor's conduct was not substandard he might have been able to prove something had the doctor done something more than he was required to do under prevailing standards.
The award of $21,000 is likewise without support. Unless plaintiff carried his required burden of proof of Dr. Pisarello's malpractice, the doctor is not liable for his or his patients' concerns or his embarrassment. There is no doubt that plaintiff suffered from these things, but Dr. Pisarello can only be made to compensate him for this suffering if his conduct was substandard under R.S. 2794. This plaintiff failed to prove.
Because I believe that plaintiff failed to carry the burden of proof imposed upon him by R.S. 9:2794 to warrant recovery in this malpractice case, I must respectfully dissent from the majority opinion and would reverse the judgment of the trial court.