363 So.2d 79 (1978)
Grace Borne, wife of/and Allen BORNE
v.
Fred O. BRUMFIELD, M. D., Eugene H. Countiss, M. D., Adolph A. Flores, Jr., M. D., James O. Lilly, M. D., Fred W. Maher, M. D. and Southern Baptist Hospital.
No. 9250.
Court of Appeal of Louisiana, Fourth Circuit.
September 13, 1978.
Rehearing Denied October 19, 1978.
*80 Lemle, Kelleher, Kohlmeyer & Matthews, William S. Penick, New Orleans, for defendant-appellant.
Satterlee, Mestayer & Freeman, A. D. Freeman, New Orleans, for plaintiffs-appellees.
Monte J. Ducote, New Orleans, for defendant-appellee.
Before SCHOTT, BEER and GARSAUD, JJ.
GARSAUD, Judge.
Grace Borne, et al., filed this malpractice suit averring that the incorrect diagnosis of gastroenteritis by Dr. Countiss prior to her admission to Baptist Hospital on February 13, 1972, the same incorrect diagnosis by Dr. Brumfield upon her admission, the incorrect diagnosis of "acute abdomen" by Dr. Flores and the incorrect diagnosis of regional ileitis by Dr. Lilly when he was called into the case on February 21, coupled with the implied concurrence by Dr. Maher in these allegedly incorrect diagnoses, caused undue delay in performing necessary surgery and resulted in serious damage to her.
*81 Mrs. Borne's condition, which apparently improved for several days following her admission to the hospital, began, thereafter, to worsen. Exploratory surgery, performed on March 2, 1972, disclosed separtive appendicitis with an abscess and a fistula from appendix to rectum. A closed colostomy was required to allow the rectum to heal, and subsequent surgery was necessary to conclude the colostomy procedure. Contending that the misdiagnosis and resulting delay in surgery caused the complications, Mrs. Borne attributed her pain, mental anguish, permanent injury (in the form of difficulty in urination and defecation which she still claims to experience as of the trial) to the negligence of all of the various defendants.
Pending trial, Dr. Maher died. More than one year subsequent to his death, his medical malpractice insurer, St. Paul Fire and Marine Insurance Company (hereafter, "St. Paul"), was joined as a defendant, notwithstanding their contention that any claim against them had prescribed.
A four-day trial (during which Southern Baptist Hospital was voluntarily dismissed) concluded with interrogatories being submitted to the jury concerning the alleged negligence of each doctor. Four of the five doctor defendants were found non-negligent; only Dr. Maher, who had died in the meantime, and who was the sole doctor the jury knew to be insured, was found negligent.[1]
The judgment awarding $43,000 to Grace Borne, and $7,000 to Mr. Allen Borne for medical expenses, was suspensively appealed by St. Paul, which contends that the jury manifestly erred in finding Dr. Maher guilty of malpractice and in rendering an excessive award. They also contend that the trial court erred in failing to hold that the claim against St. Paul had prescribed, and in failing to give certain requested jury instructions. Plaintiff answered the appeal seeking an increase in the amount of damages awarded by the jury.
St. Paul concedes that a timely suit against one solidary obligor interrupts prescription against another (La.Civ.Code art. 2097), and that insured and insurer are considered solidary obligors. They argue, however, that upon Dr. Maher's death, prescription began to run anew, and since neither his legal successor nor St. Paul were sued within a year of his death, the claim prescribed as against St. Paul.
While it is correct that action against Dr. Maher's succession requires substitution of his legal successor as party defendant, La.C.C.P. art. 802, we find no authority for the proposition that, in the absence of such substitution, prescription as to the insurer commenced anew on Dr. Maher's death. La.C.C.P. arts. 801, et seq., governing substitution of the legal successor in the event of death of a party, set no time limitations on substitution of the legal successor. Read in pari materia with La.C.C.P. art. 428 providing for the non-abatement of actions, these articles support the conclusion that Dr. Maher's death did not cause recommencement of the prescriptive period. Appellant's reliance on J. Wilton Jones Co. v. Liberty Mutual Ins. Co., 248 So.2d 878 (La. App. 4th Cir. 1971), writ refused, 259 La. 61, 249 So.2d 202, is misplaced. There, the issue before us was whether the widow's substitution as plaintiff (for recovery of survivorship benefits more than one year after decedent's death) was timely. We concluded that while a right to bring an action under La.Civ.Code art. 2315 is subject to the 1-year limitation, the right to be substituted as plaintiff in an instituted action, as defined in La.C.C.P. art. 421, is limited only by the restrictions of La.C.C.P. arts. 426 and 428, and by the substitution provisions of La.C.C.P. arts. 801-804. Thus, substitution eighteen months past the death of the original plaintiff was allowed. We noted (on rehearing):
"There is a radical difference between institution of an action and substitution of parties in an instituted action. For *82 lack of timely institution of suit, a claim is lost by liberative prescription (or in some cases by peremption). There is no time-limitation on substitution as such; this is only a procedural matter. The key issue in the substantive matter of survival is whether an instituted action abates, or whether it survives (so that substitution can occur). Once an action is instituted by either victim or survivors, since it does not abate only the five-year inaction abandonment rule of C.C.P. art. 561 is applicable, and it of course applies equally as to original plaintiffs and as to substituted plaintiffs." Id., at 891.
Though here the decedent was a defendant, the same rationale applies. La.C.C.P. art. 802, like La.C.C.P. art. 801, establishes no time limitation for substitution of parties. As in J. Wilton Jones Co., the only limitation is the five-year limitation for prosecution of the suit as provided by La.C.C.P. art. 561.
We turn to consider the contention that the jury manifestly erred: Grace Borne apparently suffered from abdominal pain commencing on Thursday, February 10, 1972. By Friday, she was experiencing diarrhea, nausea, fever and chills. Dr. Flores, whom she had seen a few days previous for unrelated complaints, advised her (by telephone) to be seen by a surgeon or gynecologist. She consulted Dr. Eugene Countiss, a gynecologist (Dr. Brumfield's partner) on Friday afternoon. Dr. Countiss apparently made a tentative diagnosis of gastroenteritis, a non-specific and non-surgical intestinal irritation. Over the weekend, the abdominal pain became more severe and her temperature rose. Dr. Brumfield, advised of these additional symptoms, concluded that Mrs. Borne should be admitted to Baptist Hospital. There, he performed a pelvic and abdominal examination and ordered tests, including a blood count as well as x-rays of the abdomen. At this point in time, Dr. Brumfield considered the possibility of appendicitis but ruled it out because Mrs. Borne's pains and tenderness were generalized over both sides of the abdomen, and would come and go in a manner similar to labor pains; she did not experience steady pain localized in the lower right quadrant as is typical of appendicitis. He believed that her high fever and increased bowel sounds (hyperperistalsis) were atypical of acute appendicitis. Thus, Dr. Brumfield confirmed his tentative diagnosis of gastroenteritis. Other than social visits, this was the last time Dr. Brumfield saw Mrs. Borne prior to her operation.
Dr. Flores, an internist who also examined Mrs. Borne at time of admission, diagnosed "acute abdomen." In his opinion, the symptoms of diarrhea, high fever, pain and tenderness on both sides of the abdomen, cramp-like pains and hyperperistalsis were atypical of appendicitis and typical of gastroenteritis.
Dr. Maher, a surgeon, also examined Mrs. Borne at the time of her admission and, additionally, reviewed the x-rays ordered by Dr. Brumfield. He found slight distention of the abdomen, mild generalized tenderness slightly more marked on the right side, rebound tendency of the abdomen, cramps and hyperperistalsis. Although he considered appendicitis as a possibility, Dr. Maher's primary diagnosis was severe gastroenteritis with peritoneal irritation, or possible ileitis (inflammation of the small intestine).
On the basis of the gastroenteritis or regional ileitis diagnosis, Drs. Flores and Maher agreed that they should treat the patient conservatively with medications (antibiotics and, later, steroids), bedrest, and a special diet. This was reinforced by their joint view that Mrs. Borne was too sick and too toxic to undergo surgery.
Thereafter, Dr. Maher saw Mrs. Borne on a daily basis and noted some favorable response to the conservative treatment, in the form of fewer cramps, less pain and a reduction in fever. But this was not to continue.
Dr. Lilly, a gastroenterologist, was called in consultation on February 21, 1972, when x-ray findings were thought by Dr. Maher to be indicative of regional ileitis. Dr. Lilly considered appendictis only as a slight possibility. His working diagnosis was regional *83 ileitis. Dr. Lilly specifically recommended no surgery.
Mrs. Borne's fever began to rise on February 25. By February 29, her white blood cell count was considerably above previous levels, and pain had increased in her right side. A joint decision to perform exploratory surgery was made by Drs. Flores, Maher and Lilly.
The exploratory surgery was performed by Dr. Maher assisted by a surgical resident. There is no allegation that the surgery was performed improperly. Appellees' contention is that the delay in its performance caused the damage.
The record essentially confirms the view that the diagnoses of gastroenteritis and regional ileitis were incorrect. However, it is clear that an error in diagnosis is not malpractice per se. In Lauro v. Travelers Insurance Company, 261 So.2d 261 (La. App. 4th Cir. 1972), writ refused, 262 La. 188, 262 So.2d 787, we approved the following jury charge as reflecting the law:
"`A physician is not obligated to always be right in making a diagnosis. It is not malpractice to miss a diagnosis. Making a diagnosis is an act of professional judgment and may not be considered as an act of negligence. This is for you to decide.'" Id., at 265-266.
Therefore, in a case of misdiagnosis, malpractice exists only if it results from a failure by the physician(s) to exercise the standard or degree of care in diagnosing which would have been exercised by members of his profession in good standing in his locality, under similar circumstances. See, Green v. State, 309 So.2d 706 (La.App. 3rd Cir. 1975), writ ref., 313 So.2d 601, and Meyer v. St. Paul Mercury Indemnity Co., 225 La. 618, 73 So.2d 781, 782 (1953).
That issue was, we believe, before the jury as a result of the testimony of Dr. Frederick J. Boyce, who expressed the view that the diagnosis of appendicitis must be foremost in the thoughts of the diagnosing physicians until that possibility can be ruled out. This premise is founded upon the likelihood of rapid development of complications, such as abscesses and perforations, when dealing with acute appendicitis. While acknowledging that the findings based on the examinations conducted at the time of Mrs. Borne's admission to the hospital would not result in a definitive diagnosis of appendicitis, Dr. Boyce held strongly to the view that if appendicitis could not be definitely eliminated, surgery was necessary.
Dr. Boyce's testimony was seriously contradicted by all other physicians who testified. In particular, Dr. James A. Stuart, a surgeon, testified that the concept that immediate surgical exploration is required where appendicitis cannot be ruled out is the medical thinking of the 1930's and 1940's, prior to the availability of antibiotics which can retard complications such as abscesses and fistulae.
Although we may have concluded differently had we been the trier of fact, we are obligated to sustain the jury's finding, absent manifest error. Canter v. Koehring Co., 283 So.2d 716 (La. 1973). We can find no error, as there was evidence in the record (Dr. Boyce's testimony) to support the jury's conclusion. In other words, the jury believed Dr. Boyce. Thus, we affirm on the question of negligence.[2]
Insofar as the assignment of error on the jury charges is concerned, we do not consider it of any merit. Suffice it to say that one charge complained of was not even given by the trial judge, another dealing with the insured doctor (Dr. Maher) is based on mere speculation, and another in the nature of a general charge on negligence was clearly limited by the special charge relating to medical malpractice.
Finally, we see no reason to disturb the jury's finding on quantum. Considering all the circumstances, we believe the verdict to be reasonable and, within the *84 mandate of Coco v. Winston Industries, 341 So.2d 332 (La.1976), we must affirm.
Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.
BEER, J., dissents.
BEER, Judge, dissenting.
If the jury, as the sole arbiter of the facts, had embraced the standard of care in diagnosis of possible appendicitis described in Dr. Boyce's testimony and rejected that described by all of the other expert physician witnesses, thus casting all of the treating physicians, I would have voted to affirm. But that is not what has happened here. The jury has, in point of fact, found in favor of all of the living doctors who participated in the diagnostic exercises with which we are here concerned but has cast only the insurer of the then deceased (conveniently?) Dr. Maher. A reading and rereading of all of the pertinent testimony in this record leads forcibly to the conclusion that it is impossible to distinguish Dr. Maher's professional responses to Mrs. Borne's symptoms from those of the other involved physicians. There was joint rejection of the original diagnosis of appendicitis; there was joint acceptance of the original diagnosis of gastroenteritis, just as there was joint acceptance of the subsequent diagnosis of regional ileitis; there was joint recommendation against surgery until February 29, when there was a joint decision in favor of same. There is absolutely no evidence whatsoever, either direct or implied, which can, even by attempted interpretation, support some sort of premise that Dr. Maher, because he was a surgeon, bore some greater or more stringent responsibility for the joint diagnoses and decisions above described. No difference of approach to diagnosis or with respect to any other facet of the handling of this case can, on this record, be perceived or demonstrated with respect to Dr. Maher.
The logical inconsistency in apparently applying Dr. Boyce's standard of care to all doctors and finding only one negligent under these facts leads to an inescapable conclusion: a well-meaning and sympathetic jury has made their finding to conform to the evidence that Dr. Maher, now deceased and, thus, beyond embarrassment, was, obviously, insured by St. Paul, since the clear and unequivocal fact of this coverage had been previously disclosed to them in a manner that proved to be as unmistakable as it was unfair. With this knowledge, their verdict indicates an effort to do right by Mrs. Borne, who had, they knew, suffered considerably.
Under these circumstances, I would not permit the verdict to stand against St. Paul (as the insurer of Dr. Maher) when the jury has specifically determined by categoric response to individually delineated interrogatories that the other physicians are blameless.
The record which supports the jury's conclusions with respect to their dismissal of the claims against Drs. Brumfield, Countiss, Flores and Lilly and also supports the voluntary dismissal of Southern Baptist Hospital also demands the dismissal of Dr. Maher's insurer. Though able counsel for appellees describes the particular basis for the jury's verdict against Dr. Maher's insurer as his "negligent and substandard approach to diagnosis," there is not a single word of testimony or any other credible evidence that in any conceivable way delineates Dr. Maher's alleged "negligent and substandard approach to diagnosis" from the approach to diagnosisor the actions taken as a result of the diagnosison the part of any or all of the physicians who the jury has seen fit to discharge from liability.
Accordingly, I respectfully dissent.
SCHOTT, Judge, concurring in denial of rehearing.
In its application for rehearing appellant has raised questions which indicate that my position needs clarification. In footnote 2 of the original opinion Judge Garsaud states that there is nothing to distinguish the action of Drs. Maher, Flores and Lilly. In his dissent Judge Beer is more emphatic when he states that all of the physicians *85 jointly rejected the diagnosis of appendicitis, jointly accepted the diagnosis of gastroenteritis and subsequently regional ileitis with a joint recommendation against surgery until February 29, and that "there is absolutely no evidence whatsoever, either direct or implied, which can, even by attempted interpretation, support some sort of premise that Dr. Maher, because he was a surgeon, bore greater or more stringent responsibility for the joint diagnoses and decisions above described."
I respectfully disagree with my colleagues on this point.
The record shows that Dr. Brumfield, a gynecologist, upon examining plaintiff in the emergency room at the hospital ruled out a gynecological problem, and then called in Dr. Flores because he, Brumfield, had made the diagnosis of gastroenteritis, a condition not normally treated by a gynecologist but one which addressed itself to the care of an expert in internal medicine, such as Dr. Flores.
When Dr. Flores examined plaintiff his immediate finding was "acute abdomen." While on the witness stand, he was asked if he wanted a surgeon in, and his answer was "I don't recall that Dr. Brumfield didn't either. He concurred with me that we have a surgeon consulted but I did want a surgeon to see her, to answer your question directly."
The hospital admit note contains Dr. Brumfield's impressions that plaintiff had severe gastroenteritis with peritinel irritations, or, possibly ileitis. With his referral of the patient to Dr. Flores, he recorded in the admit note his impression of "acute abdomen, consult surgery, Dr. Maher."
This evidence provided a basis for the jury to distinguish Dr. Maher's role from that of Dr. Flores. The jury could infer that Dr. Maher was the final expert to whom Dr. Flores deferred on the question of whether or not to operate.
As far as Dr. Lilly is concerned, he didn't see plaintiff until February 21, eight days after plaintiff had been seen by Drs. Maher and Flores. If the jury concluded that Dr. Maher's negligence consisted of his decision not to operate when plaintiff was first admitted Dr. Lilly was obviously not involved in that act of negligence.
A further basis for distinguishing Dr. Maher from the others is found in the testimony of Dr. Boyce and, to some extent, appellant's expert, Dr. James A. Stewart.
In Dr. Boyce's initial testimony, when he was being qualified, he was asked if he was familiar with the degree of knowledge or skill possessed by physicians in the field of medicine "and particularly in the field of general surgery." As a general surgeon himself, his testimony was most directly pointed to the behavior of the only general surgeon in this picture, namely, Dr. Maher. All of his testimony was from the standpoint of a general surgeon, which would lend support to the jury decision that the general surgeon in this case, Dr. Maher, was the one who had departed from Dr. Boyce's standards, not necessarily the other specialists.
Dr. Stewart, another general surgeon, was one of the principal witnesses in opposition to Dr. Boyce. He testified that acute appendicitis is the commonest of all surgical diseases and that "surgical disease refers to any condition which is appropriately managed by the surgeon." Here again was a basis for the jury to infer that Dr. Maher stood out among the others in failing to operate on plaintiff from the beginning.
I do not necessarily agree with the jury verdict. Had I been the trier of fact I may have exonerated all the physicians, including Dr. Maher, as Judge Beer would, or I may have held Drs. Flores and Lilly jointly responsible with Dr. Maher as Judge Garsaud would. But, in my role as an appellate judge I have concluded that there was evidence before the jury which furnished a reasonable factual basis for their conclusion that there was a distinction in Dr. Maher's role so that he alone was liable. Under Canter v. Koehring Company, 283 So.2d 716 (La.1973) and its progeny I feel compelled to affirm the judgment.
NOTES
[1] All five doctors were insured by St. Paul, but evidence of coverage was presented only as to Dr. Maher, by reading of his deposition.
[2] Judge Garsaud is of the opinion that, as there is nothing to distinguish the actions of Drs. Maher, Flores and Lilly, the latter two were also negligent. However, as plaintiff did not answer the appeal in this regard, the decision below cannot be amended.