467 So.2d 1238 (1985)
Emma MATTHEWS, Plaintiff-Appellant,
v.
LOUISIANA STATE UNIVERSITY MEDICAL CENTER IN SHREVEPORT, Defendant-Appellee.
No. 16860-CA.
Court of Appeal of Louisiana, Second Circuit.
April 3, 1985.
*1239 Maynard E. Cush and James D. Partin, Shreveport, for plaintiff-appellant.
A. Mills McCawley, Shreveport, for defendant-appellee.
Before MARVIN and FRED W. JONES, Jr., JJ., and PRICE, J. Pro Tem.
MARVIN, Judge.
In this medical malpractice action, Emma Matthews appeals a judgment rejecting her demands for damages for failure of doctors at the LSU Medical Center to diagnose infected "spitting" sutures after surgery. We affirm.
Plaintiff entered the Medical Center on February 21, 1978 with symptoms of intestinal blockage. A surgical team performed an exploratory laparotomy and diagnosed her condition as diverticulosis of the colon. A right transverse colostomy was performed to divert fecal matter away from the site of the surgery.
Plaintiff was readmitted to the Center on July 14, 1978. After it was determined that her colostomy site had healed sufficiently a left sigmoid colon resection was performed. The intestinal tract was reconstructed and the colostomy site was closed at the fascia level below the skin with four or more sutures which were braided polyester "Ethibond" sutures. This permanent suture was selected to avoid development of a hernia at the site. To prevent infection, doctors then packed open the outer portion of the wound with antiseptic material. The record establishes that most general surgeons in the Shreveport area would use this procedure and permanent sutures for treatment of a diverticular abscess.
Plaintiff returned for monthly post-operative checkups until November 1978. September clinic notes indicate that her wound was "healing nicely" and that the colostomy site was "filling in without difficulty." *1240 She was described as "doing well for the extensive amount of surgery she had at that time." October clinic notes state that her abdominal wound and colostomy site had "completely healed" and that she complained of "no G.I. problems at the present time." November notes continue in a similar vein and indicate that she was scheduled to receive a barium enema in three months.
The course of treatment upon which appellant's action is based began March 7, 1979, when she visited the clinic complaining of "puffiness" around the wound. Dr. Thomas Winston examined her for a possible developing hernia but none was found. She returned to the clinic on March 21, 1979, and was then examined by a Dr. Overdyke who, for the first time, noted some purulent drainage from the wound. Dr. Overdyke opened the wound, treated it with peroxide, and packed it open. This course of treatment continued through the summer of 1979. On each visit, the attending physician noted the same small amount of purulent drainage from the colostomy site, cleansed it with peroxide, and packed it open. A June surgical note indicates that it was suspected the drainage was caused by failure of plaintiff to cleanse the wound as instructed. That note also indicates complaints "of pain and inability to rest." In contrast, the note for July, 1979, when she last visited that summer, indicates that the "area is well healed."
In October 1979, plaintiff was attended by Dr. Randolph Taylor. She complained that the wound had drained and healed several times since her last visit. Dr. Taylor apparently reviewed plaintiff's record and concluded that the sutures had become infected and that her body was trying to expel or "spit" them. He applied a local anesthetic, probed the wound with a crochet hook, and removed two of the Ethibond sutures. Appellant returned in October and November 1979. Each time, doctors re-dressed the wound and noted in the records that it was closing well.
In plaintiff's view, Dr. Taylor had more effectively treated her than the other doctors at the clinic. Dr. Taylor was transferred to the V.A. Hospital in Shreveport in late 1979. Plaintiff telephoned him at the V.A. because her problem recurred. When Dr. Taylor informed her he was no longer at LSU she never returned to the LSU Medical Center.
Plaintiff did not seek further treatment until May 1980 when she visited Dr. J.C. Brierre, a private physician. Dr. Brierre treated plaintiff on 50 occasions, each time cleansing and re-dressing the wound. He found no sutures or foreign bodies in the wound during this period. Plaintiff stopped seeing Dr. Brierre in July 1981 for financial reasons.
Plaintiff went without treatment until April 1982 when she saw Dr. Boris Frohman, another private physician. He suspected a spitting stitch on plaintiff's first visit but was unable to find one until her third visit in June 1982. At that time, one suture was removed. Another was removed on a fourth visit in July 1982.
Appellant testified that during her recovery period, she suffered extreme pain and was unable to do housework or walk without the aid of her husband. She said she had no such difficulty after the fourth stitch was removed by Dr. Frohman. The defendant hospital's medical records do not indicate that plaintiff complained of these extreme difficulties to its resident physicians.
The trial court found that plaintiff had not established a negligent misdiagnosis by LSU by a preponderance of the evidence. The court concluded that a general surgeon practicing in this area under the recited circumstances could not have diagnosed the suture problem between March and October 1979 because, on each visit, it was found that the wound had healed in response to the reopening and cleansing of the previous visit. The record supports these findings.
Appellant urges that the trial court erred in determining that she failed to carry her burden of proof in negligence and determining that she did not prove the nature and extent of her damages. We find no *1241 merit in her first assignment and need not discuss her second.
A medical malpractice claimant must satisfy the elements of LRS 9:2794 which requires, in addition to the traditional elements of negligence, a special showing of the degree of skill or knowledge ordinarily possessed or exercised by general physicians or surgeons in the community under similar circumstances. She must further prove that "the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill ..." This standard of care is statutory but requires judicial determination.
The jurisprudence of this state confirms that a general physician or surgeon is not required to exercise the highest degree of care possible. His duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. He must use reasonable care along with his best judgment in the exercise of that skill. Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1953); Borne v. Brumfield, 363 So.2d 79 (La.App. 4th Cir.1978); Lauro v. Travelers Insurance Company, 261 So.2d 261 (La.App. 4th Cir.1972). The law does not require absolute precision in medical diagnoses. Acts of professional judgment are evaluated in terms of reasonableness under the circumstances then existing, not in terms of result or in the light of subsequent events. It is not malpractice to simply miss a diagnosis. Gendusa v. St. Paul Fire & Marine Ins. Co., 435 So.2d 479 (La.App. 4th Cir.1983); Tillman v. Lawson, 417 So.2d 111 (La.App. 3d Cir. 1982).
The Meyer standard of care is now statutorily recognized for such physicians as general practitioners and surgeons. LRS 9:2794(A)(1). That section also recognizes a greater standard for a doctor practicing in a particular medical specialty. See Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La.1978); Copellar v. Yount, 361 So.2d 971 (La.App. 3d Cir.1978). The LSU doctors whose conduct is complained of are not specialists and are engaged in general surgery. Expert testimony of general surgeons in this locality most accurately details the standard of care.
Plaintiff argues that although a spitting stitch is not an ordinary occurrence, it occurs often enough that it should have been recognized from her symptoms during the March 1979 treatment. She contends that the failure to diagnose the problem in March 1979 was a breach of the duty owed by the hospital's doctors. This finding, however, would impose upon the LSU doctors a duty to immediately probe the wound for an infected suture at the appearance of puffiness or purulent drainage at the colostomy site.
Local community standards for general physicians and surgeons are best determined from testimony of other experts in the field. Helms v. St. Paul Fire & Marine Ins. Co., 289 So.2d 288 (La.App. 3d Cir.1974). Drs. Taylor and Frohman were called to testify on behalf of the Medical Center. They stated that the plaintiff's condition requiring the surgery in February 1978 was potentially life-threatening and that the post-operative spitting suture problem was minor in comparison. An infection at the surgical site, they said, could cause some pain and discomfort but when the wound has drained and healed intermittently, the best or preferred treatment is to employ "conservative measures" such as cleaning and repacking. Dr. Taylor testified:
Q: Doctor, from your reading of the medical records, from March 7 or March 21 to October 11, 1979, is there any indication that the physicians did not recognize what the problem was?
A: Well, by what I understand of what they dictated they thought they were just dealing with a localized abscess and nothing further. Just a draining wound and so they treated it just like that.

*1242 Q: And the healing in, the fact that it healed in, what is the relevance of that?
A: Well, if it had not healed in they probably would have done the same thing I did [probe for sutures]. But with it healing in they were treating it just conservatively the simplest, easiest way to treat it. And if it heals in fine, you stop right there. And if it doesn't heal in, fine you go to step two. And so that's what they were doing.
Q: Was there anything improper or negligent or malpractice about the manner in which they treated her?
A: Not to my knowledge. That's the way we always treated them. And that's the way I treat them now.
Dr. John Austin was an expert witness for the Medical Center. He was familiar with plaintiff's medical records but had not examined plaintiff. On cross-examination he tetified:
Q: I believe you also testified that you considered probing for a stitch to be conservative treatment also, didn't you?
A: Generally speaking, just a mild probing of subcutaneous tissue is fairly conservative therapy.
Q: Okay, there's been quite some testimony and talk about treating this conservatively at first. Wouldn't you consider that part of conservative treatment?
A: If it hadn't healed, I would.
Q: Is there any evidence that any probing was done before March 11 [October 11] when Dr. Taylor seems to have [probed]?
A: No, but there was indication that [the wound] had healed.
Appellant relies upon testimony of Drs. Frohman and Austin that when presented with plaintiff's symptomology, they would have drained the area and looked for a stitch on plaintiff's first visit. She asserts that this testimony establishes the standard of care to be applied. Her reliance on these statements is misplaced when these statements are considered in their proper context. First, as Dr. Austin emphasized, Dr. Frohman had the benefit of more than three years of wound observation by other physicians, including Dr. Brierre. Dr. Frohman did not have the LSU medical records when he treated plaintiff, but he did have plaintiff's verbal narration of the wound's history. Further, Dr. Frohman's probing on the first treatment (the probing that Dr. Austin characterized as part of conservative treatment) did not penetrate to the fascia level where the sutures were located. Only on plaintiff's third visit several weeks later did Dr. Frohman decide that there was good reason to probe more deeply and into the fascia level. This is a procedure that was explained as being more closely akin to general surgery and clearly outside the ambit of the conservative measures characterized by all the doctors as the proper mode of treatment from March to October 1979.
It is also explained that the distinguishing features of a spit suture are not evident until a recurring pattern of drainage followed by rehealing emerges. The wound had healed on numerous occasions. Drs. Taylor and Austin considered the probability of the symptoms being caused by a spit suture insufficient to justify reopening and deep probing of the wound under local or general anesthetic when the drainage initially appeared. Dr. Austin stated that the suture was probably infected before March 21, 1979, but that a doctor would have to be "some sort of soothsayer" to detect the problem at that stage.
The record also supports the conclusion that spitting sutures became evident only after a comprehensive medical record was compiled and showed that the wound had a history of first developing granulation, displaying small amounts of purulent drainage, and then rehealing after conservative treatment. Dr. Taylor was the first to have the benefit of this knowledge. On October 11, 1979, the day on which he removed the first two sutures, he notes in the medical records that

*1243 Since the time of ... [her colostomy] ... she has had intermittent abscesses in her colostomy wound and has failed to pay attention to this and pack it open on numerous occasions. Today we took the bull by the horns and deadened this area down and incised down to the level of the fascia at which time we were able to hook with the crochet hook two Ethibond sutures which we removed ...
Dr. Austin stated that he would have "waited a little longer" before re-incising or cutting down to the fascia level. Under Dr. Austin's suggested procedure, Dr. Taylor might have been justified on October 11, 1979, in simply draining and repacking the wound as did his predecessors.
The expert evidence is contradictory whether the doctors at LSU should have acted as plaintiff asserts. The function of the appellate court, however, is to determine only whether there is sufficient evidence before the trier of fact to furnish a reasonable basis for its findings where contradiction occurs. We are not to disturb those findings in the absence of clear error, even if other conclusions from the same evidence are equally reasonable. Hingle v. Audubon Ins. Co., 427 So.2d 65 (La.App. 4th Cir.1983); Kieffer v. Southern United Life Ins. Co., 437 So.2d 919 (La.App. 2d Cir.1983); Granger v. Ehlman, 413 So.2d 228 (La.App. 4th Cir.1982); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Having found the district court's conclusion as to the standard of care, and its application, are not clearly wrong, we do not consider to what extent plaintiff suffered damages.
At plaintiff's cost, the judgment is AFFIRMED.