STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

18-292

JOHN MANTIPLY AND MELISSA SUE MANTIPLY, ET AL.

VERSUS

JOSEPH I. HOFFMAN, JR., M.D.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 242390
HONORABLE WILLIAM GREGORY BEARD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

VAN H. KYZAR
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Billy Howard Ezell, Phyllis M. Keaty, and Van H. Kyzar, Judges.

AFFIRMED.

Eugene A. Ledet, Jr.
Brian Caubarreaux
Brock H. Duke
Brian Caubarreaux & Assoc.
4501 Jackson St., Ste A
Alexandria, LA 71303
(318) 442-0900
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    John Mantiply
    Melissa Sue Mantiply

Gregory Engelsman
Eric John Miller
Bolen, Parker, Brenner, Lee & Engelsman, LTD
P. O. Box 11590
Alexandria, LA 71315-1590
(318) 445-8236
COUNSEL FOR DEFENDANT/APPELLEE:
    Joseph I. Hoffman, Jr., M.D.

**KYZAR, Judge.**

In this medical malpractice action, the Plaintiffs, John and Melissa Mantiply, appeal the judgment of the trial court dismissing their claims against the Defendant, Dr. Joseph I. Hoffman, Jr. The judgment arose following a trial by jury and in accordance with the jury verdict. For the reasons set forth herein, we affirm the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

On May 21, 2008, Plaintiff John Mantiply underwent arthroscopic surgery on his left knee to repair a torn meniscus. The surgery was performed by Defendant Joseph Hoffman, M.D., an orthopedic surgeon working as an independent contractor at the Veterans Administration (VA) Hospital. Days after the surgery, John began experiencing pain, swelling, and drainage in his left knee, causing him to return to the VA Hospital multiple times. John was seen by numerous doctors at the VA Hospital, though Dr. Hoffman remained his primary provider post-surgery until June 9, 2008, when Dr. Hoffman aspirated and cultured the fluid from John's left knee and injected the knee with cortisone on the same day without awaiting the results of the culture. Hospital records from the VA do not show an official diagnosis regarding the cause of John's knee problems. On June 26, 2008, John met with Dr. Michael Brunet, an orthopedic surgeon at Mid-State Orthopedic Clinic, regarding his continuing leg pain and lack of mobility.

The sequence of events leading up to the June 9, 2008 aspiration and cortisone injection and the current suit are as follows:

- May 21, 2008: John has arthroscopic surgery performed by Dr. Hoffman at the VA Hospital to repair a torn meniscus in his left knee.

- May 26, 2008: John presented to the Emergency Room (ER) at the VA Hospital, reporting redness, swelling, and bleeding from his left knee. The attending ER physician, Dr. Fitzgerald,

aspirated 12ml of fluid from the knee and prescribed the antibiotic amoxicillin.

- May 27, 2008: John followed up with Dr. Hoffman, who examined the knee and noted clear drainage from the needle site. No diagnosis was given, though Dr. Hoffman recommended John continue with his prescribed amoxicillin and return for his regularly scheduled follow-up appointment on May 29.

- May 29, 2008: John returns to the orthopedic clinic to see Dr. Hoffman, relating constant pain in his knee, though there was no more fluid drainage at that time. That evening, however, John returned to the ER complaining of drainage from the surgical site and again saw Dr. Fitzgerald, who noted no redness or swelling.

- May 30, 2008: John called the ER Department at the VA twice complaining of excess fluid draining from his knee. John did not present to the ER for his symptoms.

- June 4, 2008: John returned to the VA for a scheduled appointment but was sent to the ER and seen by Dr. Del Valle due to swelling and continued pain in his left knee. X-Rays were taken that revealed a supra patella effusion and soft tissue swelling. John's knee was wrapped in an ace bandage, and he was discharged with instructions to keep the leg elevated.

- June 5, 2008: John again returned to the orthopedic clinic for a follow-up appointment with Dr. Hoffman, where Dr. Hoffman noted continued drainage of clear fluid from John's left knee. Dr. Hoffman ordered a complete blood count (CBC) on this date and his notes state that this was a "very strange course of events." Dr. Hoffman renewed John's prescription for amoxicillin, though no official diagnosis was noted in the records.

- June 7, 2008: John presented to the ER complaining of sharp pains and severe burning in his left knee. Dr. Fitzgerald noted no redness or swelling and recommended John follow-up with Dr. Hoffman.

- June 8, 2008: John experienced a syncopal episode where he lost consciousness due to the pain in his knee and was admitted to the VA Hospital. A second CBC was ordered, which showed a higher white blood count (WBC) than the previous test. Dr. Clement, who saw John during this visit, also ordered that his "Sed rate" and uric acid level be checked.

- June 9, 2008: While still in the hospital, John was examined by Dr. Hoffman. Dr. Hoffman did an arthrocentesis, in which he aspirated fluid from John's knee, and submitted the fluid for culture. Before the results of that culture were received, Dr.

2

Hoffman also injected cortisone into John's knee to help with pain.

- June 10, 2008: Still hospitalized, John reported no complaints of pain in his knee to his internist, Dr. Ganji, who was treating him for the syncopal episode. Dr. Ganji ordered a CBC, which showed a higher WBC than the test done on June 8, and ordered John to be placed on Clindamycin, a potent antibiotic.

- June 11, 2008: John's WBC count was notably lower than the previous day, and he was released from the ER. The culture from June 9 came back showing a small number of staphylococcus aureus organisms, i.e. the results of the synovial fluid culture was positive for trace amounts of staph. John claims it is during this hospital stay that he first noticed the restriction of mobility in his left knee.

- June 19, 2008: John reported to the orthopedic clinic to see Dr. Hoffman, stating that his knee had become locked, though he reported no pain in the leg. Dr. Hoffman advised John to continue his prescription of Clindamycin and to return in three weeks. No official diagnosis regarding the ongoing issues with John's knee is ever recorded.

The June 19, 2008 appointment is the last encounter John has with Dr. Hoffman. Within a week of that appointment, John met with Dr. Brunet, who urgently advised him to seek additional treatment as the possibility of infection was serious. John returned to Dr. Brunet the next month for continuing knee issues, at which time Dr. Brunet suspected either a chronic infected knee or gouty synovitis. Eventually, Dr. Brunet performed a synovectomy surgery on July 23, 2008 on John's left knee, noting a thickening of the synovial lining. The mobility in John's left leg purportedly did not return, an assertion challenged by the defense at trial.

Trial by jury commenced October 10, 2017. Three medical experts testified at trial. Following deliberations on October 13, 2017, the jury returned a ten-to-two verdict in favor of Dr. Hoffman, finding that Plaintiffs failed to prove by a preponderance of the evidence that Dr. Hoffman deviated from the standard of care of a reasonably prudent orthopedic surgeon in his post-surgical treatment of John, thus awarding Plaintiffs no damages. Specifically, the jury answered "NO" to

3

question one of the jury interrogatories: "Do nine (9) or more of you find by a preponderance of the evidence, that Dr. Joseph Hoffman, Jr. breached the applicable standard of care in his treatment of John Mantiply?" A formal judgment was signed October 20, 2017. Plaintiffs timely moved for a Judgment Notwithstanding the Verdict (JNOV), which was denied. Plaintiffs seek appellate review of the jury's verdict, alleging that it is predicated on manifestly erroneous factual findings because there was no competent evidence in the record to support the jury's interpretation of the facts. Dr. Hoffman answered the appeal asserting that the trial court erred in denying his peremptory exception of prescription.

## DISCUSSION

### *Exception of Prescription*

In answer to this appeal, Dr. Hoffman asserts that the trial court erred in denying his exception of prescription. Therein, Dr. Hoffman declares that the claim against him directly, filed for the first time by an amended complaint in federal court on June 9, 2011, was untimely as not having been filed within a year of the purported malpractice or at the least from one year of discovery of the act. As a finding that the claim at hand has prescribed would render the rest of the appeal moot, we will address Dr. Hoffman's exception of prescription first. In Louisiana, delictual actions shall be brought within one year of the event causing injury. La.Civ.Code art. 3492. A hearing on the exception was held on June 13, 2016, and reasons for judgment were handed down on July 1, 2016, denying the exception. A formal judgment to that effect was signed on July 28, 2016. Dr. Hoffman thereafter applied to this court for a writ of review, which was denied. *Mantiply, et al. v. Hoffman*, 16-708 (La.App. 3 Cir. 11/30/16) (unpublished).

> A prior denial of supervisory writs does not preclude reconsideration of an issue on appeal, nor does it prevent the appellate court from reaching a different conclusion. *State v. Castleberry*, 98-

4

1388, p. 5 (La.4/13/99), 758 So.2d 749, *cert. denied*, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999). Under the doctrine of "law of the case," an appellate court will generally refuse to reconsider its own rulings of law on a subsequent appeal in the same case. *Clement v. Reeves*, 07-1154, 07-1155 (La.App. 3 Cir. 1/30/08), 975 So.2d 170, *writ denied*, 08-0482 (La.4/18/08), 978 So.2d 355; *State v. Pettus*, 11-862 (La.App. 5 Cir. 5/22/12), 96 So.3d 1240. The law of the case doctrine is discretionary. *Id.* Reconsideration of a prior ruling is warranted when, in light of a subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. *Id.* Although, we find no error in the decision by this court on the writ, and acknowledge there has been no new evidence presented, we feel it in the best interests of justice that a written discussion of the parties' arguments be undertaken. Thus, in our discretion, we decline to apply the law of the case doctrine in this instance, and will entertain LWCC's appeal.

*Hernandez v. La. Workers' Comp. Corp.*, 15-118, p. 5 (La.App. 3 Cir. 6/3/15), 166 So.3d 456, 458-59.

Similarly, we will address Dr. Hoffman's assertion in his answer to the appeal here. In Louisiana, "[n]o action for damages for injury or death against any physician . . . arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery[.]" La.R.S. 9:5628(A). The events leading to the current suit took place between May 21, 2008 and June 9, 2008. Dr. Hoffman was first named as a defendant in Plaintiffs' amended complaint on June 9, 2011. As noted by Dr. Hoffman, this is clearly outside of the allotted time period for filing such an action. Further, "in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect." La.R.S. 9:5628(A).

Plaintiffs initially began administrative proceedings in March 2010 against the United States of America and the VA and formally filed suit in federal court on December 19, 2010. Delictual actions against the United States must be brought to the appropriate federal agency within two years of the alleged act, omission, or neglect. 28 U.S.C. § 2401. Plaintiffs assert that it was not until June 8, 2011 that

counsel for the U.S. stated that Dr. Hoffman was not in fact an employee of the VA but was an independent contractor.

Plaintiffs immediately moved to include Dr. Hoffman individually in the lawsuit upon obtaining such information, asking leave to file an amended complaint to include Dr. Hoffman as a co-defendant in the federal suit and filing a request for a medical review panel per the provisions of La.R.S. 40:1231.8 on June 9, 2011, three years from the date of the cortisone injection. Upon being notified that Dr. Hoffman was not qualified under the Louisiana Medical Malpractice Act as he was only licensed in Georgia and New York, John and his wife filed suit against Dr. Hoffman on August 15, 2011. Dr. Hoffman filed an exception of prescription, noting that La.R.S. 9:5628(A) requires that medical malpractice suits be brought within one year, and at no point more than three years, from the date of the acts causing injury. Further, in actions commenced in an incompetent court or improper venue, prescription is only interrupted as to the defendant who is served within the prescriptive period. La.Civ.Code art. 3462.

The trial court denied Dr. Hoffman's exception of prescription, finding the principle of *contra non valentem* applied. It is important to note that despite the wording of La.R.S. 9:5628(A), both the one-year and three-year time limitations contained in the statute are prescriptive, not preemptive. *Borel v. Young*, 07-0419 (La. 11/27/07, 23), 989 So.2d 42, *on rehearing* (July 1, 2008). Therefore, the exception of *contra non valentem*, which suspends prescription, is applicable. *Id.* The doctrine itself is based upon the theory that when a plaintiff is not aware of the facts giving rise to his or her cause of action against a particular defendant, the running of prescription is suspended until the tort victim discovers or should have discovered the facts upon which his or her cause of action is based. *In re Med. Review Panel of Howard*, 573 So.2d 472 (La.1991). The supreme court has

6

recognized four instances in which *contra non valentem* prevents the running of liberative prescription:

>  (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action;

>  (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting;

>  (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; or

>  (4) where the cause of action is neither known nor reasonably knowable by the plaintiff even though plaintiff's ignorance is not induced by the defendant.

*Marin v. Exxon Mobil Corp.*, 09-2368, 09-2371, p. 12 (La. 10/19/10), 48 So.3d 234, 245.

"*Contra non valentem* acts to suspend prescription where the action or inaction of the plaintiff is reasonable." *Eastin v. Entergy Corp.*, 03-1030, p.8 (La. 2/6/04), 865 So.2d 49, 56. Plaintiffs argue that their ignorance regarding Dr. Hoffman's employment relationship with the VA was not willful or inexcusably negligent but was reasonable in light of the circumstances, and they introduced exhibits into the record at trial to show this. The supreme court addressed a similar issue in *Howard*, 573 So.2d 472.

In *Howard*, the plaintiff presented to an emergency room for treatment. However, it eventually came to light over a year after the incident, that the emergency room physician who provided care for him was not an employee of the hospital, but rather was employed by a separate medical group hired by the hospital. Both the trial and appellate courts sustained the doctor's exception of prescription, finding that the hospital had no obligation to disclose its contractual relationship with the emergency room doctor to the plaintiffs. *Id.* The supreme court reversed, finding that prescription did not begin to run until the plaintiff was made aware of

7

the relationship between the emergency room doctor and the hospital, per the doctrine of *contra non valentem. Id.* The court found that the key inquiry in a *contra non valentem* case is the commencement date of the one-year prescriptive period contained in the statute, which is dependent upon the "*reasonableness* of the claimant's action or inaction." *Id.* at 474.

> Constructive knowledge sufficient to commence the running of prescription requires something more than a mere apprehension that something might be wrong. *Cordova v. Hartford Accident & Indemnity Co.*, 387 So.2d 574 (La.1980). Prescription does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligent or *unreasonable. Young v. Clement*, 367 So.2d 828 (La.1979).

*Id.*

In the instant case, John presented himself to the VA. He was treated there by Dr. Hoffman, who was wearing VA medical center attire. The VA itself defended Plaintiffs' claims against it until informing Plaintiffs' counsel that Dr. Hoffman was not an employee of the VA, over a year after proceedings were initiated. While Plaintiffs could have chosen to name Dr. Hoffman personally as a defendant in the initial petition, it was not necessary for them to do so if Dr. Hoffman was a VA employee. *See Howard*, 573 So.2d 472. Based upon the above facts and the circumstances set up by Dr. Hoffman and the VA, Plaintiffs' belief that Dr. Hoffman had an employment relationship with the VA was reasonable. *See Eastin*, 865 So.2d 49. As such, we find the principle of *contra non valentem* applies to halt the running of prescription in the case at hand, and we, accordingly, find no error in the trial court's denial of Dr. Hoffman's exception of prescription.

**Breach of the Standard of Care**

*Standard of Review*

The jury in the instant case specifically found that Dr. Hoffman did not breach the applicable standard of care in his treatment of John. The determination of

whether Dr. Hoffman breached the standard of care is a factual determination subject to the manifest error standard of appellate review and thus a court of appeal may not set aside the trial court's or jury's finding unless it is manifestly erroneous or clearly wrong. *Greer v. State, Through Dep't of Transp. & Dev.*, 06-417 (La.App. 3 Cir. 10/4/06), 941 So.2d 141, *writ denied*, 06-2650 (La. 1/8/07), 948 So.2d 128. Before an appellate court can reverse a factfinder's determination of fact, it must review the record in its entirety and meet the following two-part test: (1) It must find that a reasonable factual basis does not exist for the finding; and (2) It must determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. *Stobart v. State, Through Dep't of Transp. & Dev.*, 617 So.2d 880 (La.1993); *Smith v. St. Paul Fire & Marine Ins. Co.*, 07-285(La.App. 3 Cir. 10/3/07), 966 So.2d 1205.

*Burden of Proof*

In order to establish a medical malpractice claim, La.R.S. 9:2794(A) provides that the plaintiff has the burden of proving three essential elements:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians . . . licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances, and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians . . . within the involved medical specialty[;]
>
> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill[;]
>
> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

Thus, Plaintiffs had the burden of proving, by a preponderance of the evidence, the standard of care for treating a patient such as John, that Dr. Hoffman breached that applicable standard of care, and that Dr. Hoffman's breach was the

9

cause of John's injuries. *See Browning v. W. Calcasieu Cameron Hosp.*, 03-332 (La.App. 3 Cir. 11/12/03), 865 So.2d 795, *writ denied*, 03-3354 (La. 2/13/04), 867 So.2d 691.

*Standard of Care*

In malpractice actions, the degree of knowledge or skill possessed, or the degree of care ordinarily exercised is commonly referred to as the standard of care. *Vaughan v. Sanders Vision Ctr. & Children's Eye Clinic*, 06-651 (La.App. 3 Cir. 11/2/06), 941 So.2d 682. Medical specialists are held to a uniform standard of care based upon national standards existing within the specialty, as codified in La.R.S. 9:2794. *Matthews v. Louisiana State Univ. Med. Ctr. in Shreveport*, 467 So.2d 1238 (La.App. 2 Cir. 1985). The jurisprudence of this state makes clear that a physician's duty is to "exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. He must use reasonable care along with his best judgment in the exercise of that skill." *Id.* at 1241 (citing *Meyer v. St. Paul-Mercury Indem. Co.*, 225 La. 618, 73 So.2d 781 (1953), *overruled on other grounds*, 360 So.2d 1331 (La.1978)). Absolute precision in medical diagnoses is not the required standard of care in this state, which standard is best determined from testimony of other experts in the field. *Id.*

Three medical experts testified in the instant case in order to establish the requisite standard of care: Dr. Brunet, Dr. Foster, and Dr. Hoffman, himself, all board-certified orthopedic surgeons. Dr. Brunet saw John multiple times for treatment for his leg after John's May 21, 2008 surgery with Dr. Hoffman and an eventual, second surgery on the same knee on July 23, 2008. Dr. Foster's original involvement in the case was on behalf of the VA as an independent medical examiner, though he testified at trial on John's behalf. Dr. Hoffman served as a medical expert in his own defense.

10

Drs. Brunet and Foster testified as to the standard of care required for the treatment of an infected knee. Dr. Hoffman, in contrast, consistently testified that he believed John's knee problems to be the result of synovitis caused by gout. Dr. Brunet testified that even if gout was suspected, in cases of differential diagnoses, the potential infection should have been confirmed and/or treated first, as it would be the more serious threat. Dr. Brunet stated that the fluid aspirated from John's knee on his first return to the VA after surgery should have been cultured, and that bloodwork and investigation was required by the standard of care as early as May 29, 2008. He testified that the standard of care mandates that culture results from the aspirate should have been obtained before injecting a potentially infected knee with cortisone.

Dr. Foster testified that the standard of care required a recognition of the possibility of infection, motivating an aspiration and culture with at least some form of treatment, such as a washout or debridement. Dr. Foster further stated that an administration of intravenous antibiotics until infection was ruled out by a culture of the knee fluid would have been the applicable standard. However, Dr. Foster agreed that an injection of cortisone and Marcaine, as given to John by Dr. Hoffman, is consistent with a diagnosis of gout and treatment thereof. All three experts agreed that knowingly injecting cortisone into an infected knee is a serious breach of the standard of care required by physicians.

*Breach*

In order to recover, Plaintiffs must have not only established the standard of care, but they had the burden of showing, by a preponderance of the evidence, that said standard was breached by Dr. Hoffman in his treatment of John. *See Browning*, 865 So.2d 795. Both Drs. Brunet and Foster rendered opinions that Dr. Hoffman breached the standard of care. Both medical experts testified that Dr. Hoffman's

11

failure to aspirate, culture, and debride John's knee in a timely manner, combined with his failure to administer antibiotics, fell below the required standard of care for an orthopedic surgeon. All three testifying medical experts agreed that injecting an infected knee with cortisone, as Dr. Hoffman did to John's knee on June 9, 2008, would be a significant breach of the requisite standard of care, and both Drs. Brunet and Foster opined that Dr. Hoffman's injection of cortisone without the benefit of a bacterial culture confirming that the knee was not infected was, likewise, a breach. Dr. Hoffman, in contrast, testified that John never suffered from an infected knee, but was suffering effects caused by a gouty flare-up. It is undisputed that Dr. Hoffman's actions constituted standard treatment for gout.

In *Matthews*, 467 So.2d 1238, the second circuit was presented with a similar case. In it, the plaintiff was admitted for a successful surgery, and the surgery site was subsequently closed with braided polyester sutures. The plaintiff returned multiple times for post-surgery checkups, complaining of pain, drainage, and puffiness around the wound, though medical records had previously noted the wound was healing nicely. *Id.* On each visit, the wound was cleaned and repacked by the attending physician. *Id.* It was not until seven months after the plaintiff's first visit complaining of pain that she was diagnosed with spitting sutures and treated accordingly. *Id.* The plaintiff sued, asserting that the spitting sutures causing her pain should have been diagnosed much sooner. *Id.* The trial court found that the plaintiff had not established a negligent misdiagnosis by a preponderance of the evidence. *Id.* The second circuit affirmed, finding that though the expert testimony presented at trial was conflicting, the standard requires a physician's use of "reasonable care along with his best judgment" in the exercise of skill ordinarily employed by his professional peers and that as long as a reasonable basis existed for the trial court's findings, those findings would not be disturbed. *Id.* at 1241.

12

Dr. Brunet's official report states that Dr. Hoffman's injection of cortisone into a knee he knew to be infected was a "serious deviation" from the standard of care. However, the dates written in this report do not match the dates of treatment on John's medical records. Specifically, the culture of the fluid aspirated from John's knee containing trace amounts of bacteria was not received until after the injection of cortisone. Further, the culture's results do not conclusively prove that John's knee was infected at the time of the injection. Dr. Brunet noted, when he examined John's knee on June 23, 2008, that he was unsure if John's symptoms were caused by a chronic infectious synovitis or gouty synovitis. He did not mention his own potential breach of the standard of care during his treatment of John when he also injected cortisone into John's knee to ease pain before testing for infection.

Dr. Foster's testimony regarding Dr. Hoffman's potential breach of the standard of care centered mainly around Dr. Hoffman's failure to diagnose infection of the knee as the cause of John's problems and failure to take measures consistent with that diagnosis. Dr. Foster stated that Dr. Hoffman deviated from the standard of care by not recognizing the signs and symptoms of a possible infection and by injecting cortisone without awaiting the results of the culture taken immediately prior. He testified that it was error to not actively consider infection as the cause of John's issues. He opined that Dr. Hoffman erred by not interpreting John's WBC as a sign of worsening infection, even though those numbers were improving at the time of the cortisone injection. Plaintiffs assert the decreased count was attributable to the in-hospital administration of antibiotics John received, rather than a sign that the knee was not infected; although John did not take any of his prescribed antibiotics while not admitted to the VA and his knee was shown to be free of infection at the time of Dr. Brunet's surgery some six weeks later. Even Dr. Foster testified that it would be highly unlikely that a knee joint infection would have

13

resolved itself on its own before the surgery performed by Dr. Brunet in this time period and further that the dosage of antibiotics given to John at the VA was unlikely to have been an effective dose.

Dr. Hoffman, who was also certified as an expert witness by the trial court, maintained throughout trial and this appeal that John was not suffering from an infected knee, but rather from an episode of gout, with which he had a history of problems. Though such a diagnosis cannot be found written in any of John's relevant medical records, Dr. Hoffman's injection of cortisone and Marcaine into John's knee after his continued complaints of pain was consistent with a diagnosis of gout, as confirmed by Dr. Foster. Dr. Foster noted that if John's knee had been infected when it was injected with cortisone, he most likely would have lost his leg at that time, rather than have the improvement in his condition that actually resulted.

> The jurisprudence of this state confirms that a general physician or surgeon is not required to exercise the highest degree of care possible. His duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. He must use reasonable care along with his best judgment in the exercise of that skill. *Meyer v. St. Paul-Mercury Indemnity Co.*, 225 La. 618, 73 So.2d 781 (La.1953); *Borne v. Brumfield*, 363 So.2d 79 (La.App. 4th Cir.1978); *Lauro v. Travelers Insurance Company*, 261 So.2d 261 (La.App. 4th Cir.1972). The law does not require absolute precision in medical diagnoses. Acts of professional judgment are evaluated in terms of reasonableness under the circumstances then existing, not in terms of result or in the light of subsequent events. It is not malpractice to simply miss a diagnosis. *Gendusa v. St. Paul Fire & Marine Ins. Co.*, 435 So.2d 479 (La.App. 4th Cir.1983); *Tillman v. Lawson*, 417 So.2d 111 (La.App. 3d Cir.1982).

*Matthews*, 467 So.2d at 1241.

Dr. Hoffman, based upon his professional knowledge and judgment, found John to be suffering from synovitis caused by gout and treated him accordingly. Both Dr. Brunet and Dr. Foster admitted in testimony that all of John's symptoms could have been explained by gout. John had a history of gout and gouty flare-ups in response to previous surgeries. Further, though Dr. Hoffman did not record his

14

purported diagnosis of gout in John's medical record, neither was John explicitly diagnosed with an infection despite being treated by multiple other physicians during his post-surgery visits to the VA. Although one of the physicians did place him on antibiotics without recording a diagnosis of infection, a second physician treating John in the ER of the VA ordered a test for gout and placed John on gout medication. Dr. Brunet also included gout in his original differential diagnosis and initially concluded that it was the cause of John's continuing knee issues. This diagnosis did not change until well after his treatment of John had concluded.

The jury in the instant case found that Dr. Hoffman did not breach the standard of care in his treatment of John. A jury's finding of fact may not be set aside unless it is manifestly erroneous or clearly wrong. *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106 (La.1990). "In order to reverse a jury's determination of fact, an appellate court must review the record in its entirety and find that: 1) a reasonable factual basis does not exist for the jury's finding; and 2) the record establishes that the factfinder is clearly wrong." *Stobart*, 617 So.2d at 882. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). Further, where the findings are based on determinations regarding the credibility of witnesses and the factfinder's decision to credit the testimony of one of two or more witnesses, the manifest error standard demands great deference to the findings of fact, and such findings can virtually never be manifestly erroneous. *Id.* "This rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony." *Bellard v. Am. Cent. Ins. Co.*, 07-1335, 07-1339, p. 27 (La. 4/18/08), 980 So.2d 654, 672 (citing *Lasyone v. Kansas City S. R.R.*, 00-2628, (La.4/3/01), 786 So.2d 682).

15

The jury was presented with testimony from three, separate, qualified medical experts. This expert evidence differed regarding Dr. Hoffman's treatment of John's knee and its relation to the required standard of care. Though both Dr. Brunet and Dr. Foster testified that Dr. Hoffman breached the standard of care, it is clear from the evidence that at least one other treating physician, i.e. Dr. Brunet, found gout to be a reasonable diagnosis based upon John's symptoms. While this court reviews the record in its entirety, our function is to determine "only whether there is sufficient evidence before the trier of fact to furnish a reasonable basis for its findings where contradiction occurs. We are not to disturb those findings in the absence of clear error, even if other conclusions from the same evidence are equally reasonable." *Matthews*, 467 So.2d at 1243.

The jury heard all of the expert testimony, made determinations based upon the credibility of said expert testimony, and found Dr. Hoffman did not breach the standard of care. Where there is conflicting expert testimony, the jury's decision to credit the testimony of one witness of two or more should not be disturbed on appeal in the absence of manifest error. *Bellard*, 980 So.2d 654. Based on our thorough review of the record, we find that two permissible views of the evidence exist, as shown by the conflicting expert testimony. As such, we cannot say that the jury was manifestly erroneous or clearly wrong in finding that Plaintiffs failed to prove that Dr. Hoffman breached the standard of care, as is required by La.R.S. 9:2794 in order to prevail in such instances. *See Rosell*, 549 So.2d 840. Having concluded that the jury was not manifestly erroneous in their finding, we do not consider to what extent Plaintiffs suffered damages.

## DISPOSITION

16

In accordance with the foregoing, we affirm the ruling of the trial court, dismissing the claims of John and Melissa Mantiply against Dr. Joseph I. Hoffman, Jr. All costs of this appeal are assessed to John and Melissa Mantiply.

**AFFIRMED.**

17